## STOCK GROWER'S STATE BANK v. MILLARD.

(No. 968; Decided December 30, 1919; 186 Pac. 121.)

Attachment—Grounds for Attachment Before Debt Due—
Sufficiency of Evidence of Intent to Defraud Creditors—Dis-
posal of Property for Payment of Debts—Bulk Sales Law—
Omission of Debts from List of Creditors—Evidence of Intent
to Change Legal Residence—Garnishment—Insolvency Not
Grounds for Attachment Before Debt Due.

1. In attachment proceedings before debt due, the gist of the
   matter is the intent of the debtor to defraud his creditors
   and it must be shown that certain things were done by the
   defendant, that are given in the statute (Comp. Stat. 1910,
   Secs. 4890-96) as grounds for attachment, and done to
   hinder, delay and defraud his creditors. The burden of
   proving this intent to defraud is upon the plaintiff.
2. In attachment proceedings before debt due, upon the grounds
   that defendant had sold, or was about to sell, his drug
   business with intent to defraud his creditors, evidence held
   to show that defendant sold his business with an honest
   intent to pay his creditors.
3. Where it is shown that defendant has disposed of most of
   his property for the purpose of paying his debts and used
   the proceeds for that purpose, held, not to show a fraudu-
   lent intent and not grounds for attachment.
4. In the absence of knowledge or connivance by the purchaser,
   the omission of a creditor from the list furnished by the
   seller in an attempt to comply with the Bulk Sales Law
   (Laws 1911, Chap. 33 as amended by Laws 1913, Chap.
   14) was not grounds for attachment before debt due under
   Comp. Stat. 1910, Secs. 4890-96.
5. In proceedings for attachment before debt due, evidence of
   statements of defendant that he intended to go into the
   National Army, and that he intended to get a job in
   another state, was insufficient to show intent to change
   his legal residence, or a fraudulent intent on the part of
   the defendant, or sufficient grounds for attachment.
6. In view of Comp. Stat. 1910, Secs. 4864, 4876, the maker
   of a note should not be charged as garnishee of payee
   under attachment served before maturity, unless it be
   affirmatively shown that before rendition of judgment, the
   note had become due and was still the property of the
   payee.
7. The fact that defendant had disposed of his property and
   was insolvent, would not in itself, be grounds for attach-

ment before debt due, it not being shown that he had disposed of a note taken on sale of his property, which was not due for three years. If he was still the owner of the note so that a garnishment would lie at all as to it from the evidence, he was far from insolvent, and had a substantial balance over all his debts and liabilities.

APPEAL from District Court, Washakie County; HON. P. W. METZ, Judge.

Action by the Stock Grower's State Bank against L. A. Millard from an order discharging attachment and plaintiff appeals. The material facts are stated in the opinion.

*C. H. Harkins* and *H. C. Brome,* for appellant.

It was clearly shown that defendant intended to leave town; it was also shown by the admissions of defendant himself that he had not complied with the requirements of the bulk sales law by furnishing a complete list of his creditors; it was also shown by his own admissions that he was insolvent; the disappearance of several thousand dollars from defendant's assets without reason or explanation, the transfer of his book accounts to his wife, and his refusal to give any information touching the amount due or collected, compels the conclusion that he had disposed of his property with the intent to defraud his creditors; it was shown by his admissions that he was about to become a nonresident of the state, with the same intent (International Silver Co. v. Hull, 45 L. R. A. N. S. 493).

*E. E. Enterline* and *H. W. Rich,* for respondent.

The appeal should be dismissed; appellant failed to prepare the record on appeal within 70 days after the making of the order discharging the attachment; the record does not show the specifications of error to have been filed within 10 days after the filing of the record on appeal (Hahn v. Bank, 171 Pac. 889; 172 Pac. 715; Goodrich v. Bank, 174 Pac. 191, 177 Pac. 134; Laws 1917, Chap. 32, Sec. 8); it was shown by the evidence that respondent used the proceeds from the sale of his drugstore to pay his creditors; there was no showing that he used said proceeds for any

other purpose; it was further shown that he offered to raise and pay $3,200.00 on his note given appellant before its maturity, and further offered to secure the balance of the note by depositing collateral; there was no grounds for attachment; appellee had a right to prefer a creditor if he so desired (Bank v. Ranch Co., 5 Wyo. 50); no fraudulent intent could be imputed to respondent in the disposition of his property; the order discharging attachment should be affirmed.

BLYDENBURGH, JUSTICE.

This case was brought to secure an attachment "before debt due" under the provisions of Chapter 311 (Sections 4890-4896), Wyoming Compiled Statutes 1910. A motion was made to discharge the attachment, a traverse to the affidavit for attachment filed by the defendant, and a hearing was had before the court below on the issue thus made. The court ordered the attachment discharged, and the plaintiff excepted to this order of the court. The case is brought here on direct appeal, the specifications of error alleging error only in making this order.

The grounds alleged for the attachment, as contained in the affidavit, are as follows:

"That said L. A. Millard has sold, conveyed, or otherwise disposed of, his property with the fraudulent intent to cheat and defraud his creditors, and to hinder and delay them in the collection of their debts."

"That said L. A. Millard is about to sell, convey, or dispose of, his property with the fraudulent intent to cheat and defraud his creditors, and to hinder and delay them in the collection of their debts."

"That the said L. A. Millard is about to become a non-resident of the State of Wyoming with the intent to defraud his creditors."

The affidavit of defendant in support of his motion to discharge the attachment is a specific denial of each of the grounds set up in the affidavit for attachment denying them in the same language. The plaintiff caused garnishee notices

to be served under the attachment on both itself and upon Wyoming Sugar Company, a corporation, and no attempt was made to serve the attachment in any other way or to attach any tangible property. The answer filed by the plaintiff bank as garnishee was "That said Stockgrower's State Bank of Worland, Wyoming, has on deposit to the credit of said L. A. Millard, defendant, the sum of Sixteen Hundred Dollars", and the answer of Wyoming Sugar Company was to the effect that it owed a promissory note made payable to L. A. Millard in the sum of $5,000, said note being dated March 1, 1918, and due March 1, 1923, bearing interest at the rate of 6% per annum, which note was secured by a mortgage signed Wyoming Sugar Company on certain mentioned real estate, interest payable annually.

At the beginning of the hearing, after defendant had moved to dismiss the garnishment of the money in the plaintiff's hands, the plaintiff confessed this part of the motion and released the garnishment of the Stockgrowers' State Bank of Worland, the plaintiff. So the hearing proceeded with the only matter held under the attachment such as was evidenced by the answer of the Wyoming Sugar Company.

The facts, as shown by the record, are that the defendant was in 1918 engaged in the drug business at Worland; that he had borrowed from the plaintiff bank money evidenced at the time the suit was brought by two promissory notes, one for $3,500 and one for $1,500, each dated June 12, 1918, and each due 180 days after date with interest at the rate of 8 per cent. per annum, and these notes not yet due were the basis of this suit commenced Sept. 12, 1918. That on Aug. 2, 1918, the defendant entered into a contract for the sale of his entire stock and the fixtures of his drug business to George D. Cureton by the terms of which Cureton was to pay the defendant cash upon the completion of an inventory and $1,000 was to be deposited in the plaintiff bank at the execution of the contract to apply on the purchase price to be held by the bank in escrow with a copy of the agreement and to be paid to the defendant as liqui-

dated damages in case Cureton failed to comply with his
part of the agreement. There was to be allowed Cureton
$700 discount from the invoice price, Cureton was to take
possession within 30 days from the date of the agreement
of sale and the property was to be invoiced on or about 25
days from the date of the agreement, the defendant in the
meantime to remain in possession and conduct the busi-
ness. The defendant agreed to "comply with the bulk sales
law or furnish satisfactory bond to protect Cureton against
outstanding bills at the option of defendant." That the
plaintiff bank knew of the proposed sale and a cashier's
check of the plaintiff bank was deposited in escrow with
the plaintiff with a signed copy of the agreement as provided
in said agreement. The invoice was not completed until
about the 9th of September, Cureton in the meantime having
made an arrangement to go into partnership with R. C.
Schultz in the drug business and had gone east, leaving
Schultz to take charge of the invoice and complete the deal.
The amount the invoice showed should be paid the defendant
Millard was $9,602.75, and there was left with B. J. Keys,
the cashier of the First National Bank of Worland, a check
of Schultz on said First National Bank for $5,102.75, and
a check of Cureton on the Citizens' National Bank of Chey-
enne for $3,500, which, with the $1,000 deposited with the
plaintiff bank in escrow, made the $9,602.75, the amount to
be paid the defendant for his stock of drugs. On the 9th
of September the defendant Millard went to Keys at the
First National Bank and presented what purported to be a
list of his creditors and asked that the checks be turned
over to him. Keys refused, as he claimed his instructions
from Schultz were that Millard was to deposit a bond as
well as a list of creditors. This list at that time was not
sworn to. Millard went to see Schultz, who was at a garage
getting ready to go out of town, and Schultz told him that
if he would swear to the list he would direct Keys to turn
over the checks, which he did over the telephone. Keys,
who was a notary public, wrote under the list furnished by

Millard, "I hereby certify that above is a list of all my creditors.                 . . . . . . . . . . . . . . . . . . . . . . .

Subscribed and sworn to before me this 9th of Sept., 1918.                         ·          B. J. KEYS,
                                     Notary Public."

And the next morning when Millard came into the bank he had him sign it and then delivered to him the two checks of Schultz and Cureton, which checks the defendant immediately deposited to his checking account in the plaintiff bank, together with the $1,000 cashier's check that was in escrow, and as he at that time had an overdraft of $49.61 he had a credit to his checking account of $9,553.14. The defendant at once drew checks against this balance to pay his creditors, and among others one for $3,732.50 to pay $3,500 and interest due the First National Bank of Worland on a past due note, which indebtedness to the First National Bank and the notes in suit in this case given to the plaintiff bank were not given in the list of creditors, and there was also omitted therefrom several small amounts to other creditors, the statements or memoranda of which the defendant testified had become mislaid. The defendant was sworn as a witness and examined by and on behalf of the plaintiff and explained this by testifying that he thought he only had to give a list of his wholesale creditors,—those who had supplied goods for the store, and that Schultz told him all he wanted was a list of his wholesale creditors, and that he had told him that the list he had furnished was such a list, as near as he could remember, and as a fact he had no intention of omitting any such creditors. Upon the check for $3,732.50 to the First National Bank coming in to the plaintiff bank, its vice president and manager sought to collect the undue notes on which this suit is based, first charging defendant's checking account with the amount thereof without defendant's knowledge or consent and crediting the amount back when he became convinced he had no right to do that and then by demand upon defendant for payment. Defendant explained that he would not have cash enough to pay all his creditors the amount due them if he

paid these undue notes in full, but offered to pay $3,200 in cash and give a note for $2,000 secured by a life insurance policy and to pay $25 per month on the new note, which offer was rejected by the plaintiff bank. Cureton, who was in the east, was advised by wire that he had better stop payment on the $3,500 check on the Citizens' National Bank of Cheyenne, which check had been sent on for payment by the plaintiff bank, and did so, but with his partner Schultz went into possession of the drug store. The plaintiff bank brought this suit and garnisheed the money remaining in the checking account of defendant and refused payment of all the checks issued to his creditors by the defendant that were presented thereafter, the balance to defendant's credit with said plaintiff bank at that time and at the time of the hearing, the $3,500 check having been charged back after payment was stopped, being $1,606.10. Cureton, after his return on Sept. 14th, began paying the creditors of the defendant whose checks issued by the defendant had been refused payment by the plaintiff bank out of the money represented by the $3,500 check that he had stopped payment on, and at the time of the hearing had left in his hands a balance of this $3,500 of $262.57. This was done without the consent or any notice to the defendant. It appeared from the testimony of the defendant that after the invoice of the stock both he and his wife had collected such accounts as were owing to him by customers of the drug business, most at least being small in amounts, and such amounts as his wife collected were deposited in her own name in the First National Bank of Worland and since the suit and attachment the defendant and his wife had been using this money for their living expenses. It also appeared that when the defendant first solicited a loan from the plaintiff in March, 1918, he made a statement of assets and liabilities showing assets amounting to $11,653.00 and liabilities of $5,195, or a net worth of $6,458. The only evidence offered as to the last ground in the affidavit for attachment "that the defendant was about to become a non-resident of the State of Wyoming with intent to defraud his

creditors" is a statement he is said to have made to Cureton during the pendency of the deal when Cureton was inquiring about getting a house to live in, "that he was going to go into the army if possible", and as Cureton said: "He told me he was going to leave town and I could get his house he was living in" and "I am living in a four-room house. You can get that if you want it", and he told Muirhead, the vice president and manager of the plaintiff bank, that "he was going to Denver to get a job with Davis Brothers".

In attachment proceedings, before debt due, the grounds are not only certain things were done by the defendant that are given in the statute as grounds for attachment, but these things must be done to hinder, delay and defraud creditors, in other words, the gist of the matter is the intent of the debtor to defraud his creditors, and with that intent he does the acts alleged; if he does the acts for a lawful and legitimate purpose an attachment will not lie and will be allowed only upon the grounds and conditions of the statute providing for attachment before debt due (2 R. C. L. 814). In this case each ground stated in the affidavit alleges the "intent to defraud his creditors" and the traverse specifically denies this fraudulent intent. So the whole matter resolves itself to, Did the defendant Millard dispose of his property with intent to defraud his creditors? and the burden of proving this intent to defraud was upon the plaintiff.

The whole evidence shows that he sold his drug business with the honest intent to pay his creditors, and he had drawn checks to pay all his debts that were due against the proceeds of the sale deposited in the plaintiff bank and they would all have been paid had payment not been stopped on the $3,500 check on the Citizens' National Bank of Cheyenne in the first place and then the plaintiff bank refusing to pay the checks of creditors as they came in, although it had a balance of over $1,600 to defendant's credit after deducting the $3,500 in order that it might hold this money to be applied on its not due notes. There was no effort to conceal the transactions from the plaintiff or any of his creditors,

and the contract was placed in escrow in the plaintiff bank and all the proceeds of the sale were deposited with the plaintiff.

That a defendant has disposed of most of his property for the purpose of paying his debts and used the proceeds for that purpose does not show a fraudulent intent and is not ground for attachment (6 C. J. 59; Blakemore v. Eagle, 73 Ark. 477, 84 S. W. 637; Breeden v. Peale, 106 Va. 55, S. E. 2). In the last mentioned case the court said: "All that can be said is that Churchill owed a debt to Peale which he was unable to pay; * * * that he preferred other creditors, as he had a right to do; that he appropriated the proceeds of the property, sold at a fair price, to the satisfaction of claims of other creditors; and his purpose to make that sale was not only not concealed, but was discussed between the debtor and his creditor. These facts do not, in our judgment, make out the case stated in the affidavit for an attachment—that the defendant had disposed of or was about to dispose of his estate or some part thereof, with intent to hinder, delay, or defraud his creditors."

In the case of Iosco County Sav. Bank v. Barnes (Mich.), 58 N. W. 606, on page 608, the court said in reference to preferring some creditors to others: "It was to aid in carrying out the arrangement made, and to pay the interest on the amount necessary to do so. The keeping it away from one set of creditors to the advantage of another would be no evidence of fraud. He had a right to prefer one creditor over another, and to pay off one class first in preference to another."

The case of Tenney et al. v. Diss, 48 N. W. 877, is a Nebraska case where the statute being taken from Ohio is like ours and the facts are very similar to the case at bar; the case being brought and an attachment had on a note before it was due, the grounds alleged in the affidavit for attachment being the same as the first two grounds in the case at bar, a traverse was filed by the defendant and hearing had on a motion to dissolve the attachment. The court said: "The testimony shows that the defendant executed

three chattel mortgages upon his stock of goods, the aggregate of which was about $2,600; that he was owing other debts, and that his creditors were pressing him for payment; that thereupon he sold the entire stock, subject to the mortgages, to one William Tuomey for about the sum of $1,400. This money, it is claimed and the testimony tends to show, was applied by the defendant in the payment of his debts. It does clearly appear that the defendant is a *bona fide* purchaser of the goods in question, and that there was no intent in purchasing said stock to defraud the creditors of the defendant. The order discharging the attachment is sustained by the clear weight of the testimony, and is affirmed."

In Wearne v. France, 3 Wyo. 273, 21 Pac. 703, it was held that the making preference of several creditors to others while a debtor held control over his property did not constitute a fraudulent disposition of his property within the meaning of the attachment law.

The sale did not injure the plaintiff and "to support the attachment it must be made to appear that the attaching creditor is injured by the transfer or disposition relied on" (6 C. J. 57; Zeigler v. W. J. & J. H. Cox, 63 Ill. 48; Keith & Co. v. McConald, 31 Ill. App. 17). In this last case it was said: "The act complained of in the affidavit must be injurious to the attaching creditor, though it is sufficient if the affidavit charges, in the language of the statute, that it operated to delay and hinder creditors, without the particular specification of injury to the plaintiff, which is to be implied." And again in regard to preferring creditors: "She had the right to prefer one creditor to another, and so doing (while carrying on her business and not being about to yield dominion of her property for the benefit of creditors), was not fraudulent, nor in a legal sense was it such hindrance or delay of creditors as might furnish ground for attachment by those who were unpaid."

It is claimed that the fact that certain debts were omitted from the list of creditors furnished by the defendant to the purchaser under an attempt to comply with the Bulk Sales law was fraudulent and gave ground for attachment. The

Bulk Sales law does not provide that the sale shall be void by the omission of the seller to furnish a complete list of his creditors.  It provides that in case the purchaser shall fail to demand a list of his creditors from the seller and shall not at least five days before taking possession of such merchandise or merchandise and fixtures or paying therefor notify "every creditor *whose name and address is stated in said list* or of which he has knowledge of the proposed sale and of the price, terms and conditions thereof" the sale shall be prima facie void as to creditors of the seller and upon application of any creditor of the seller the purchaser shall "become a receiver and be held accountable to such creditors for all goods, wares, merchandise and fixtures that have come into his possession by virtue of such sale" (Chap. 33, Sess. Laws of Wyoming, 1911, as amended by Chap. 14, Sess. Laws 1913).

In the case of International Silver Co. v. Hall (Ga.), 78 S. E. 609, 45 L. R. A. (N. S.) 492, the question was whether the omission of a creditor from the list furnished by the seller under a Bulk Sales law very like ours would render the sale void and the Supreme Court of Georgia held that it would not in the absence of knowledge or connivance by the purchaser.

As to the third ground for the attachment, That Millard was about to become a non-resident of the State of Wyoming with intent to defraud his creditors, it is evident that the evidence offered as to this is the statements of Millard that he intended to go into the National Army and that he intended to get a job with Davis Brothers of Denver, Colorado, fall far short of showing an intent to change his legal residence.  The evidence introduced does not show any fraudulent intent on the part of the defendant nor any of the grounds alleged in the affidavit for attachment and the lower court could not do otherwise than sustain the motion discharging the attachment.

There is another reason why the attachment might have been discharged, although the record does not show that it was raised or referred to in the court below.  At the time

of the hearing the only property of the defendant that was pretended to be held under the order or writ of attachment was by reason of the answer of the Wyoming Sugar Company in answer to the notice of garnishment served upon it. It is peculiar that this answer was signed and sworn to by the same attorney as attorney for the sugar company, garnishee, who swore to the affidavit for attachment as attorney for the plaintiff. Without referring to the lack of ethics thus shown and the charge that an attorney in so doing comes near at least to acting on opposite sides of a matter it may be questioned if a mere attorney at law not being an officer of the corporation can make an answer to a garnishment for a corporation. But the answer itself shows that the corporation had given its promissory note payable to the defendant Millard dated March 1st, 1918, and due March 1st, 1923, interest payable annually. This answer was made Oct. 21, 1918, and therefore shows that at that time there was nothing due on this negotiable instrument to Millard or anyone else. Does such an answer attach or garnish anything? It is held generally "that the maker or endorser of commercial paper cannot be made a garnishee in an action against the payee or holder thereof prior to the maturity of such paper" (20 Cyc. 1006 and cases cited, 12 R. C. L. 789). In some states it is held that the proceeds of such a note are subject to garnishment, but it must be shown in order to hold the maker as garnishee that the note is still held by the defendant at not only the time of the answer of the maker as garnishee but also that it continues to be payable to the defendant at the time it is due and has not been endorsed and transferred to a *bona fide* holder. Drake on Attachments has an exhaustive discussion of this question extending over 14 pages and reviewing the views held by the courts of the various states under their several statutes, and in section 583, 5th Ed., says:

"§ 583. It is difficult to perceive any substantial justification of such a proceeding; while, obviously, it disregards principles which, by general consent, have been laid at the foundation of all attempts to subject garnishees to liability.

It cannot be without benefit to recur to those principles in this connection.  1.  Without dissent, it is impossible to charge a garnishee as a' debtor of the defendant, unless it *appear affirmatively* that, at the time of the garnishment, the defendant had a cause of action against him, for the recovery of a legal debt, due, or to become due by the efflux of time. 2.  The attachment plaintiff can hold the garnishee responsible (except in some few cases which have been referred to, and have no application here), only so far as the defendant might hold him by an action at law.  3.  The garnishee is, under no circumstances, to be placed by the garnishment in a worse condition than he would otherwise be in.  4.  No judgment should be rendered against him as garnishee, where he answers fairly and fully, unless it would be available as a defense against any action afterwards brought against him, on the debt in respect of which he is charged."

"§ 584.  Applying these well-established principles to this subject, it would seem quite impracticable to charge the maker of a negotiable promissory note, as garnishee of the payee, so long as the note is still current as negotiable paper. This character it bears until it becomes due; and no operation which can be given to the garnishment of the maker, can change its nature in this respect:"

"§ 585.  While the note is current as negotiable paper, it is usually very difficult for the maker to say whether, at the time of the garnishment, it was still the property or in the possession of the payee.  If he answers that he does not know whether it was so or not, certainly he should not be charged, because it does not *appear affirmatively* that he was, when garnished, indebted to the defendant; and unless that fact do so appear, no court can rightfully render judgment against him.  The most that can be claimed is, that he *may* be so indebted, which is manifestly insufficient.  The great fact necessary to charge him is not shown, but only conjectured.  The whole matter is in doubt; and while in doubt the court cannot with truth record that the garnishee is found to be indebted to the defendant; and unless that

be found by the judgment of the court, there is no ground for charging the garnishee * * *."

"But though the garnishee should answer that the defendant, at the time of the garnishment, was the owner of the garnishee's note, not then due, no judgment should be rendered against him, because *his obligation is not to pay to any particular person, but to the holder, at maturity, whoever he may be.* Can the garnishee, or the defendant, or the court, say that the defendant will be the holder of the note at its maturity? Certainly not; and yet to give judgment against the garnishee, necessarily assumes that he will be; or, in disregard of the contrary probability, holds the garnishee to a responsibility which he may have to meet again in an action by a *bona fide* holder at maturity." And concludes in section 587 as follows: "The foregoing considerations lead to the conclusion that, as a general rule, the maker of a negotiable note should not be charged as garnishee of the payee, under an attachment served before the maturity of the note, *unless it be affirmatively shown, that, before the rendition of the judgment, the note had become due, and was then still the property* of the payee." And this conclusion is sustained by an examination of our statutes on attachment and garnishment. Section 4864, Wyo. Comp. Stat. 1910, provides: "The garnishee shall stand liable to the plaintiff in attachment for all property of the defendant in his hands, and *money and credits due* from him to the defendant, from the time he is served with the written notice mentioned in § 4856."

Section 4876 provides that the court may order the garnishee to pay into court the amount that his answer shall show he was indebted to the defendant, or if the court permit the garnishee to retain the "amount owing" he shall be required to furnish an undertaking to the plaintiff for the payment of the amount. It is evident that this could not apply to the amount of a note not due as in this case, for more than three years and to whom it may be payable when due the garnishee can in the nature of things not know. In the case of Knisely v. Evans, 34 Ohio St. 158, from

which state our statutes on attachment and garnishement are taken, the court held that where a negotiable note had been transferred by endorsement even after maturity, the amount due on the note can not be garnisheed in the hands of the maker whether he has notice of the transfer or not as a debt due to the original holder.

In addition to the fact that the answer of the garnishee shows that the note was not due for over three years and there is no evidence going to show where the note was or who was the holder at the time of the hearing except that the plaintiff examined the defendant as its witness and asked him, "You had no other property after you sold out except the proceeds of the sale." To which he answered, "No, sir." This would go to show that this note had been negotiated and was not the property of Millard at the time of the hearing; and from this testimony the plaintiff argues that he was and pronounced himself insolvent and that the hearing showed that several thousand dollars of assets had disappeared from the time he had commenced business with the plaintiff bank without explanation therefore "compels the conclusion that he had disposed of his property with intent to defraud his creditors" and justified the attachment. Such fact in itself would not be ground for the attachment, and if he was still the owner of the note so that a garnishment would lie at all as to it from the evidence he was far from insolvent, but had a substantial balance over all his debts and liabilities.

Under the circumstances and evidence in this case there was nothing held by the garnishment and no property held under the attachment writ.

The order and judgment of the District Court will be affirmed.                                    *Affirmed.*

BEARD, C. J., and POTTER, J., concur.